11 CIV 5024

JUDGE COTE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IRAQI REFUGEE ASSISTANCE PROJECT
Urban Justice Center
123 William Street, 16th Floor
New York, NY 10038,

                    Plaintiff,

      v.

DEPARTMENT OF DEFENSE
100 Defense Pentagon
Washington, DC 20301-1000,

DEPARTMENT OF STATE
2201 C Street, N.W.
Washington, DC 20520,

                  Defendants.

No. _____



RECEIVE
JUL 21 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR INJUNCTIVE RELIEF

### Preliminary Statement

1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking injunctive and other appropriate relief and the immediate processing and release of agency records requested by the Iraqi Refugee Assistance Project ("IRAP") from Defendants U.S. Department of Defense ("DOD") and U.S. Department of State ("DOS").

2.    On September 7, 2010, Plaintiff submitted FOIA requests ("2010 Requests") to the DOS and three components of the DOD—the Office of Inspector General ("DOD-IG"), the Defense Contract Management Agency ("DCMA"), and Central Command ("CENTCOM")— requesting the release of records relating to the human trafficking and/or labor abuses of third country nationals ("TCNs") on U.S. military bases in Iraq and Afghanistan since January 2006.

3.      Specifically, the 2010 Requests sought from the DOD-IG and the DOS the release of records relating to formal or informal complaint mechanisms, investigations and/or prosecutions, applicable laws, legal or administrative remedies, and training materials relating to human trafficking and/or labor abuses of TCNs on U.S. military bases in Iraq and Afghanistan since January 2006. The 2010 Requests sought from the DCMA the release of records relating to quality assurance inspections, oversight mechanisms, trafficking and/or labor complaints, and benefits provided to subcontracted workers as such records related to the human trafficking and/or labor abuses of TCNs on U.S. military bases in Iraq and Afghanistan since January 2006. The 2010 Requests also sought from CENTCOM the release of records relating to the basis for its jurisdiction over contracted workers, trafficking and/or labor complaints, and training materials as such records related to the human trafficking and/or labor abuses of TCNs on U.S. military bases in Iraq and Afghanistan since January 2006.

4.      In its requests, Plaintiff sought a waiver of search, review, and duplication fees. Defendant DCMA granted this request. Defendant DOD-IG determined that Plaintiff did not qualify for a fee waiver, and it denied further consideration because Plaintiff had not made a commitment to pay fees. Defendant CENTCOM denied a fee waiver after determining that the information sought by Plaintiff would "not contribute 'significantly' to public understanding of government operations or activities." Defendant DOS deferred the determination of a fee waiver until it could determine whether the release of responsive records would be in the public interest.

5.      The records sought by Plaintiff would assist greatly in the public's understanding of the treatment of TCNs on U.S. military bases overseas. To date, billions of taxpayer dollars have been spent to fund logistics contracts that employ tens of thousands of TCNs, who—for low wages—cook, clean, and provide other logistical support services for the military on its bases in

Iraq and Afghanistan. Little public information is available detailing the work and living conditions of TCNs, despite their numbers equaling or exceeding that of U.S. soldiers. Media reports have brought to light a host of abuses suffered by these men and women, including trafficking, forced labor, fraud, squalid living conditions, and sexual assault. The exact nature and extent of these abuses and any measures taken to remedy them remain unknown. Release of the requested records is critical for ascertaining the current conditions of TCNs and providing a basis for assessing what measures need to be implemented to stem further abuses.

6.     Despite the clear importance to the public interest of the records Plaintiff seeks, Defendants DOD-IG, DCMA, and DOS have yet to produce a single responsive document or to adequately justify the ten-month delay in responding to Plaintiff's request. More than six months after the initial request, Defendant CENTCOM released a single responsive complaint form and an outline of a training manual, but it has released nothing since this initial release. Plaintiff seeks an injunction requiring Defendants to fully process the 2010 Requests immediately.

<b>Jurisdiction and Venue</b>

7.     This Court has both subject matter jurisdiction over the FOIA claim and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

<b>Parties</b>

8.     Plaintiff Iraqi Refugee Assistance Project ("IRAP") is a nationwide, non-profit, non-partisan organization that organizes law students and attorneys to provide legal representation to Iraqi refugees and conduct fact-finding and policy advocacy on issues related to

Iraq. IRAP has twelve chapters at law schools across the United States and overseas and is dedicated to protecting the interests of displaced persons without legal representation.

9.     Defendant DOD is a Department of the Executive Branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

10.    Defendant DOS is a Department of the Executive Branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## Factual Background

### The Increasing Public Concern About Trafficking and Treatment of TCNs on U.S. Military Bases Overseas

11.    "Third country nationals," or "TCNs," is the term commonly used to describe non-local, non-American foreign nationals who are contracted to work on U.S. military bases overseas. *See* Moshe Schwartz, *The Department of Defense's Use of Private Security Contractors in Afghanistan and Iraq: Background, Analysis, and Options for Congress*, Cong. Res. Service, May 13, 2011, *available at* http://www.fas.org/sgp/crs/natsec/R40835.pdf [hereinafter *CRS Report I*].

12.    TCNs often come from South Asia and Africa and are hired to work on U.S. military bases through a convoluted subcontracting system that frequently begins with a local recruiting agency in a worker's country of origin. *See* Sarah Stillman, *The Invisible Army*, New Yorker, June 6, 2011, at 56. These local recruiting agencies often charge exorbitant fees for the promise of comparatively high-paying jobs overseas. In turn, these local agencies contract with larger recruitment agencies based in the Gulf states, that in turn enter into contracts with U.S.-based corporations such as Kellogg, Brown Root ("KBR") and DynCorp International to supply the essential low-cost staff that supports U.S. soldiers on bases in Iraq and Afghanistan.

4

13.     While media coverage has focused on private security contractors operating in Iraq and Afghanistan, they account for less than 20% of contractors working in those countries. By far the largest category of private contractors are logistics contractors, who provide services such as cooking, cleaning, and construction, yet little is publicly known about their operations.

14.     The Congressional Research Service has reported on the use of logistics contractors in Iraq and Afghanistan. *See* Moshe Schwartz & Joyprada Swain, *Department of Defense Contractors in Afghanistan and Iraq: Background and Analysis*, Cong. Res. Service, May 13, 2011, *available at* http://www.fas.org/sgp/crs/natsec/R40764.pdf [hereinafter *CRS Report II*]. This report reveals that TCNs are employed on U.S. military bases in the two countries and that, in Iraq, contracting personnel make up 58% of all personnel on U.S. bases, an estimated 64,253 DOD contractor personnel as compared to an approximated 45,660 uniformed personnel. *See CRS Report II*, at 6, 15. Of the DOD contractor personnel, an estimated 39,000 perform logistical support functions, such as laundry services and running dining halls, and 37,000 of all contracting personnel are TCNs. *See id.* at 15, 17.

15.     Statistics on personnel on military bases in Afghanistan are similar to statistics in Iraq. The *CRS Report II* estimates that DOD contracting personnel make up 48% of all personnel in Afghanistan—approximately 90,339 DOD contractor personnel. *See id.* at 6, 9. Of these workers, an estimated 24,000 are TCNs. *Id.* at 10. The DOD does not maintain a public breakdown of the services that contractors in Afghanistan supply, apart from private security contractors.

16.     Despite the scale of U.S. military contracting in Iraq and Afghanistan, media outlets report that there is little oversight of the contracting process, and once recruited, there is little or no monitoring of contractors. Media reports have also highlighted a long history of

abuse suffered by TCNs. In 2005, the *Chicago Tribune* reported on the trafficking of a group of

twelve Nepali workers onto U.S. military bases in Iraq. *See* Cam Simpson, *Pipeline to Peril:*

*Part 1: Desperate for Work, Lured into Danger*, Chi. Trib., Oct. 9, 2005, at C1; Cam Simpson,

*Pipeline to Peril: Part 2: Into a War Zone, On a Deadly Road*, Chi. Trib., Oct. 10, 2005, at CN1.

Simpson's articles describe how many TCNs paid large recruiting fees with the promise of

lucrative jobs in Jordan. Upon arrival in Jordan, the Nepali workers discovered that their actual

destination was Al Asad Air Base in Iraq. The men had taken out loans of approximately $3,500

each to cover recruiting costs. When the men's families heard that their sons and brothers were

actually destined for Iraq, despite the apparent danger to their lives, they nonetheless encouraged

the men to go to cover the recruiting fees, which amounted to over a decade of earnings. In the

face of specific warnings from the American and British governments about the dangers of

travelling on the Amman-Baghdad highway and that travel should be undertaken only when

"absolutely necessary," the company transporting the Nepali workers sent the workers along this

highway in an unarmed caravan. On the road, the caravan was stopped and the workers were

kidnapped by insurgents. Eleven of the workers were reported to have been shot to death; the

twelfth was beheaded.

      17.    In a legal complaint filed on behalf of the deceased Nepali workers, surviving

workers declared that they had repeatedly told KBR that they had been brought to Iraq against

their will and wished to return home. *See* Complaint at 87-95, *Adhikari v. Daoud & Partners*,

697 F. Supp. 2d 674 (S.D. Tex. 2009) (No. 09 Civ. 1237). These workers claim that KBR told

them that they had no choice but to remain in Iraq until they completed their contracts.

      18.    In December 2008, Najlaa International Catering, a subcontractor of KBR, was

reported to have held 1,000 Asian men in "windowless warehouses" outside of Baghdad for up to

three months. *See, e.g.*, Adam Ashton, *Military Contractor in Iraq Holds Foreign Workers in Warehouses,* McClatchy Newspapers, Dec. 2, 2008, *available at*

http://www.mcclatchydc.com/2008/12/02/56910/military-contractor-in-iraq-holds.html.  These

men had their passports confiscated, had no money, and had no place to work, despite having

been brought into the country for Najlaa's service contracts with U.S. military bases.  Reports

also noted that the workers had paid fees of up to $2,000 each for jobs that they had been told

would pay $600 to $800 per month.

19.     Najlaa's treatment of the Asian workers it held violated 2006 military regulations

prohibiting excessive fees, prohibiting the seizure of passports, and establishing certain basic

living conditions for TCNs. *See* General Casey, *Prevention of Trafficking in Persons MNF-I*,

MNF-I FRAGO 06-188 (April 2006).

20.     Most recently, a June 2011 article in *The New Yorker* featured the story of a group

of Fijian women who had been trafficked on to U.S. military bases in Iraq to work as beauticians.

They had been hired in Fiji by a local recruitment agency to work at luxury hotels in Dubai. *See*

Sarah Stillman, *The Invisible Army*, New Yorker, June 6, 2011, at 56.  Upon their arrival in

Dubai, the women were informed that they were actually bound for Iraq.  Many of the women,

who had taken out loans to cover recruiting fees, felt compelled to travel to Iraq despite the

danger to their lives.  In addition, officials from the recruitment company reportedly threatened

some of the women with more than $1,000 in early termination fees if they returned home.  Once

in Iraq, the Fijian women's contracts were reduced to a fraction of what they had been promised

in Fiji.  Before being paid at all, the women were all required to sign contracts stating that they

would work twelve hours a day, seven days a week with overtime hours that they were unable to

refuse. *See* Sarah Stillman, *Primary Sources: The Invisible Army*, NewYorker.com (June 2,

2011), *available at* http://www.newyorker.com/online/blogs/newsdesk/2011/06/primary-sources-the-invisible-army.html. Beyond these labor abuses, one Fijian woman was repeatedly sexually assaulted by her employer in Iraq and, when she turned to the U.S. military authorities for assistance, could find no one to address her claims.

21.     Stillman's article reports on a number of other disturbing facts. In the first half of 2010, contractor deaths were estimated at 53% of all deaths on U.S. bases in Iraq—a number that many believe is significantly underestimated due to underreporting by contractors. In addition, Stillman reports that when certain individuals attempted to bring abuses to light, they were reprimanded while the abuses remained unaddressed.

22.     In the face of mounting reports of abuse, the U.S. government adopted some measures aimed at preventing trafficking, stemming other abuses and generally improving the overall working and living conditions of TCNs. In April 2006, following the deaths of the Nepali workers, General Casey, then commanding general of Iraq, issued a memorandum that required all TCNs to retain their passports. *See* General Casey, *Prevention of Trafficking in Persons MNF-I*, MNF-I FRAGO 06-188 (April 2006). The memorandum also guaranteed TCNs certain basic standards of living and required military contractors to incorporate language into their contracts prohibiting the use of unlicensed recruiting firms or firms that required the payment of excessive recruitment fees.

23.     Despite the stipulations in General Casey's memorandum, abuses of TCNs continued. On July 26, 2010, the bi-partisan Commission on Wartime Contracting in Iraq and Afghanistan held a hearing, "Subcontracting, Who's Minding the Store?" Testimony provided during the hearing confirmed continued labor abuses and lackluster contractor monitoring. Some of these concerns were recently highlighted in Stillman's *New Yorker* article and underscore the

critical need for government disclosures concerning the nature and extent of abuses suffered by TCNs and government actions that have been taken to ensure effective oversight of contractors and to remedy abuses.

The 2010 FOIA Requests

24.    In September 2010, Plaintiff IRAP submitted the 2010 FOIA Requests for records relating the human trafficking and/or labor abuses of TCNs on U.S. military bases in Iraq and Afghanistan since January 2006.

25.    Plaintiff sought expedited processing of the 2010 Requests on the grounds that the current conditions of many TCNs pose an imminent threat to their life and safety and that there is a substantial humanitarian and due process interest in securing accurate information about the conditions of TCNs.  Defendants denied the request on the grounds that Plaintiff had not proven that an imminent threat to the life and safety of TCNs existed and that, based on the information alleged, a compelling due process or humanitarian need was not present.

26.    Plaintiff sought a waiver of search, review, and duplication fees on the grounds that disclosure of the requested records is "likely to contribute significantly to public understanding of the operations or activities of the Government" and "is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II), (a)(4)(A)(iii); *see also* 22 C.F.R. § 171.17(a); 32 C.F.R. § 286.28(d).

27.    Plaintiff also sought a waiver of search and review fees on the grounds that IRAP is a student organization within New York University School of Law and Yale Law School, which have § 501(c)(3) non-profit tax status, and have no commercial interest in the disclosure of the requested records. *See* 22 C.F.R. § 171.17(a)(2); 32 C.F.R. § 286.28(d)(3).

## The Government's Response to the 2010 Requests

28.     The 2010 Requests have been pending for ten months with the DOD-IG, DCMA,
and DOS without a single responsive record produced.  Only Defendant DCMA has provided
any basis for the delay, citing "unusual circumstances" under 5 U.S.C. § 552(a)(6)(B)(iii).
However, the DCMA has not complied with its own extended time estimations and has given no
reason for non-compliance.  After over a six month delay, Defendant CENTCOM produced only
two responsive documents.

### *Defendant DOD-IG*

29.     On September 17, 2010, Defendant DOD-IG sent Plaintiff a letter acknowledging
receipt of the 2010 Request and denying Plaintiff's request for expedited processing and denying
consideration of a fee waiver.  Defendant DOD-IG denied consideration of a fee waiver on the
grounds that IRAP was not a news media organization and refused to assess a fee waiver for any
other reason because Plaintiff had not made a commitment to pay fees.

30.     On November 15, 2010, Plaintiff filed a timely appeal of Defendant DOD-IG's
adverse determination.  Plaintiff appealed its placement in the "other" category for fee
determinations and maintained that a release of the requested documents warranted a fee waiver
because such a release is in the public interest.  Plaintiff also listed the amount in fees that it was
willing to pay.  Plaintiff has received no response to its appeal.  The DOD-IG has not articulated
any basis for the delay or withholding of responsive records.

### *Defendant DCMA*

31.     On September 27, 2010, Defendant DCMA sent Plaintiff a letter acknowledging
receipt of the 2010 Request, denying Plaintiff's request for expedited processing, and granting
Plaintiff's fee waiver request.  Defendant DCMA, citing "unusual circumstances" under 5 U.S.C.

10

§ 552(a)(6)(B)(iii), indicated that Plaintiff's request would take longer than the twenty-day time limit mandated by 5 U.S.C. § 552(a)(6)(A)(i).

32.     Ten months after the initial filing of the 2010 Request, Defendant has not produced a single responsive document or adequately justified the substantial delay in responding to Plaintiff's request.

*CENTCOM*

33.     On September 17, 2010, Defendant CENTCOM sent Plaintiff a letter acknowledging receipt of the 2010 Request, denying Plaintiff's request for expedited processing, and denying Plaintiff's request for a fee waiver.  CENTCOM denied Plaintiff's fee waiver request on the grounds that the information that Plaintiff seeks "does not contribute 'significantly' to public understanding of government operations or activities."

34.     On November 15, 2010, Plaintiff filed a timely appeal of Defendant CENTCOM's adverse determination.  Plaintiff appealed its placement in the "other" category for fee determinations and maintained that a release of the requested documents warranted a fee waiver because such a release is significantly within the public interest.  Plaintiff also listed the amount in fees that it was willing to pay.

35.     On April 5, 2011, CENTCOM issued a partial release of Plaintiff's 2010 Request. CENTCOM stated that it withheld portions of the release pursuant to 5 U.S.C. § 552(b)(2), (b)(3), and (b)(6).  The partial release consisted of one complaint form and an outline of a training manual.  The release also stated that fees were not assessed for the request.

36.     On May 18, 2011, Plaintiff filed a timely appeal of Defendant CENTCOM's partial release.  Plaintiff appealed the withholding of documents pursuant to 5 U.S.C.

11

§ 552(b)(2), (b)(3), and (b)(6). Plaintiff also appealed the non-responsiveness of the partial release to portions of Plaintiff's 2010 Request.

37.     As of the date of this filing, Plaintiff has yet to receive a response to the adverse fee waiver determination from CENTCOM's FOIA officer or CENTCOM's appellate body.

*Defendant DOS*

38.     On October 14, 2010, Defendant DOS sent Plaintiff a letter acknowledging receipt of the 2010 Request and deferring the determination of a fee waiver until Defendant DOS was able to determine whether the release of the responsive records was in the public interest. Nine months after this initial acknowledgement, Plaintiff has yet to receive a single document from the DOS. The DOS has not articulated any basis for the delay or withholding of responsive records.

**Causes of Action**

First Cause of Action:
Violation of the FOIA for Failure to Promptly Make
Available the Records Sought by Plaintiff's Requests

39.     Defendants' failure to promptly make available the records sought by the 2010 Requests violates FOIA, 5 U.S.C. § 552(a)(3)(A), and Defendants' corresponding regulations.

Second Cause of Action:
Violation of the FOIA for Failure to Make Reasonable
Efforts to Search Records Sought by Plaintiff's Requests

40.     Defendants' failure to make reasonable efforts to search for records sought by the 2010 Requests violates FOIA, 5 U.S.C. § 552(a)(3)(C), and Defendants corresponding regulations.

Third Cause of Action:
Violation of the FOIA for Failure to Expedite
the Processing of Plaintiff's Requests

41.    Defendants' failure to expedite the processing of Plaintiff's 2010 Requests

violates FOIA, 5 U.S.C. § 552(a)(6)(E)(iii), and Defendants' corresponding regulations.

Fourth Cause of Action:
Violation of the FOIA for Failure to Respond
Timely to Plaintiff's Requests

42.    Defendants' failure to respond timely to Plaintiff's 2010 Requests violates the

FOIA, 5 U.S.C. § 552(a)(6)(A), and Defendants' corresponding regulations.

Fifth Cause of Action:
Violation of the FOIA for Failure to Grant Plaintiff's
Request for a Limitation of Fees

43.    Defendants DOD-IG, CENTCOM, and DOS's failure to grant Plaintiff's request

for a limitation of fees violates FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II), and Defendants'

corresponding regulations.

Sixth Cause of Action:
Violation of the FOIA for Failure to Grant Plaintiff's
Request for Waiver of Search, Review and Duplication Fees

44.    Defendant DOD-IG, CENTCOM, and DOS's failure to grant Plaintiff's request

for a waiver of search, review, and duplication fees violates FOIA, 5 U.S.C. § 552(a)(4)(A)(iii)

and (a)(4)(A)(viii), and Defendants' corresponding regulations.

**Request for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Order Defendants to immediately process and produce all records responsive to

   Plaintiff's 2010 Requests;

13

B. Enjoin Defendants from charging Plaintiff search, review, or duplication fees for

processing of the 2010 Requests;

C. Award Plaintiff its costs and reasonable attorneys' fees incurred in this action; and

D. Grant such other relief as the Court may deem just and proper.

Dated: July 21, 2011

Respectfully submitted,

Alexander Abdo (AA-0527)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
Tel.:  (212) 549-2517
Fax.:  (212) 549-2652
aabdo@aclu.org

Steven Watt (Admission Pending)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
Tel.:  (212) 519-7870
Fax.:  (212) 549-2652
swatt@aclu.org